IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 02-815-01 |
| | : | |
| JAMAL EZELL | : | |

## PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PETITIONER'S PRO SE MOTION AND COUNSEL'S AMENDED MOTIONS PURSUANT TO TITLE 28 U.S.C § 2255

Attorney, Luther E. Weaver, III, Esquire, on behalf of Defendant Jamal Ezell (the "Defendant"), hereby files these Proposed Findings of Fact and Conclusions of Law in support of Petitioner's Pro Se Motion and Counsel's Amended Motion pursuant to Title 28 U.S.C § 2255.

The Defendant will be referring to the following exhibits which were attached to Counsel's Amended Motion and Memorandum of Law pursuant to Title 28 U.S.C § 2255:

- The transcripts of the trial: Exhibit "A" (May 2, 2013); Exhibit "B" (May 3, 2013); Exhibit "C" (May 4, 2013); Exhibit "D" (May 5, 2013) and Exhibit "E" (May 6, 2013).

- The Government's trial Exhibit List attached as Exhibit "F."

The Defendant also attaches hereto as Exhibit "G" the Transcript of the Evidentiary Hearing held pursuant to said Motions on April 30, 2015.

## PROPOSED FINDINGS OF FACT

## I. PROCEDURAL HISTORY

1. On December 17, 2002, a federal grand jury in the Eastern District of Pennsylvania returned a 12-count Indictment charging Petitioner Jamal Ezell with six counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Counts 1, 3, 5, 7, 9 and 11), six counts of using and carrying and aiding and abetting the using and carrying of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2 (Counts 2, 5, 6, 8, 10 and 12). (See Docket, Document 1, Indictment).

2. The Indictment alleged that the Petitioner along with others committed six robberies in and around Philadelphia, Upper Darby, and Upper Merion Township, Pennsylvania, between March 5, 2002 and March 20, 2002. (See Docket, Document 1, Indictment).

3. A four-day trial was held from May 2 to May 6, 2005. During the trial, the Defendant was represented by Christopher Warren, Esquire. (Counsel's Amended Motion, Exhibits "A"-"E"); (Exhibit "G," at 10, Testimony of Christopher Warren, Esquire).

4. On May 6, 2005, the Defendant was found guilty by a jury on all counts of the Indictment. (Counsel's Amended Motion, Exhibit "E," pp. 122-126).

5. On March 3, 2006, the Defendant was sentenced by the Court to serve a term of imprisonment of 132 years (1584 months) and one day. The sentence was imposed as follows:

- Count(s) 1, 3, 5, 7, 9 and 11: imprisonment 1 day; supervised release 3 years; restitution in the sum of $15,000.00; special assessment $1,200.00;

- Count 2: Imprisonment 84 Months, consecutive to Counts. 1, 3, 5, 7, 9 and 11; supervised release 5 years; restitution in the sum of $15,000; special assessment of $1,200.00;

- Counts 4, 6, 8, 10, 12: imprisonment 300 months on each Count, to be served consecutively, and consecutive to Counts. 1, 2, 3, 5, 7, 9 and 11; supervised release 5 years; restitution in the sum of $15,000; special assessment $1,200.00. The Judgment of the District Court was formally entered on March 7, 2006. (See Docket, Document 174).

6. The Defendant appealed the Judgment of the District Court to the United States Court of Appeals for the Third Circuit. (See Docket, Documents 175 and 177).

7. On February 19, 2008, the United States Court of Appeals for the Third Circuit affirmed the Judgment of the District Court entered on March 7, 2006. This Order was formally entered in the

docket of the United States District Court District Court on March 12, 2008. (See Docket, Document 187).

8.	The Defendant filed a Writ of Certiorari to the United States Supreme Court, which was denied on December 1, 2008.

9.	Following the direct appeal, the Petitioner filed a number of pro se Motions in District Court, including a Pro Se Motion pursuant to Title 28 U.S.C. §2255 to, set aside and correct the sentence imposed by the Court on March 3, 2006, which was filed on November 20, 2009. (See Docket, Document 196).

10.	On May 9, 2013, the Court granted the Motion of Attorney NiaLena Caravasos, Esquire to withdraw from representing the Defendant, and Attorney Luther E. Weaver, III was appointed to represent the Defendant with regard to the Defendant's pending Pro Se Motion pursuant to §2255. (See Docket, Document 215).

11.	On September 17, 2013, Attorney Weaver filed Counsel's Amended Motion and Memorandum of Law pursuant to Title 28 U.S.C § 2255.  (See Docket, Document 225).

12.	On February 18, 2014, the Government filed the Government's Response to Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255. (See Docket, Document 231).

13.	On March 25, 2014, the Defendant filed Petitioner's Memorandum in Reply to the Government's Response to Petitioner's Original and Amended Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. §2255. (See Docket, Document 233).

14.	On April 30, 2015, a hearing was held on Petitioner's Pro Se Motion and on Counsel's Amended Motion. A transcript of the proceedings was prepared and is attached hereto as Exhibit "G."

15.    On May 14, 2015, this Court filed an Amended Order regarding post hearing filings, ordering that on or before June 8, 2015, the Defendant shall file and serve a supplemental memorandum of law and request for findings of fact and conclusions of law, and requiring the Government to respond on before June 29, 2015. (See Docket, Document 247).

II.    DEFENDANT'S REMAINING CLAIMS

16.    At the hearing on April 30, 2015, the Court and the parties clarified the claims which were withdrawn and those which were still being pursued by the Defendant from the Defendant's Pro Se Motion and Counsel's Amended Motion. Claims "A. Ground One" and "B. Ground Two" of the Defendant's Pro Se Motion have been withdrawn. These claims involved two former defense attorneys for the Defendant who withdrew from this case prior to trial,  Eric Vos, Esquire (Claim A) and Mark Cedrone, Esquire (Claim B). (Exhibit "G" at 133-134).

17.    Claim Section III(F) of Defense Counsel's Amended Motion is purely a question of law. Counsel agreed to confer with the Defendant and to notify the Court of the Defendant's position with regard to said issue.  (Exhibit "G" at 140-142).

18.    The Defendant is still pursuing the remaining claims in the Defendant's Pro Se Motion and in Counsel's Amended Motion, which are based on the pretrial and trial performances of the Defendant's third attorney, Christopher Warren, Esquire. The Defendant contends that he was denied his right to effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution for the following reasons:

A.    Defense counsel failed to object to inadmissible bad act evidence which established that the defendant had prior arrests and/or convictions; (Pro Se Motion, "D. Ground Four"; Counsel's Amended Motion, Section III(A));

B.      Defense counsel presented ineffective opening and closing arguments to the jury; (Pro Se Motion, "D. Ground Four"; Counsel's Amended Motion, Section III(B));

C.      Defense counsel was ineffective during the plea bargaining process; (Pro Se Motion, "C. Ground Three"; Counsel's Amended Motion, Section III(C));

D.      Defense counsel pursued a jurisdictional defense which he knew was contrary to the law; (Pro Se Motion, "C. Ground Three" and "D. Ground Four"; Counsel's Amended Motion, Section III(D));

E.      Defense counsel's overall performance denied the Defendant a fair trial; (Pro Se Motion, "D. Ground Four"; Counsel's Amended Motion, Section III(E)). (Exhibit "G" at 133-140).

## III.     PROPOSED FINDINGS OF FACT RELATING TO SPECIFIC CLAIMS

### A.      Claim that Defense Counsel Failed to Object to Prejudicial Bad Act Evidence

19.     Prior to the start of trial, trial counsel knew that the Defendant had a criminal record which included a criminal conviction. (Exhibit "G" at 11-14, Testimony of Christopher Warren, Esquire). However, defense counsel never discussed his record with the Defendant, nor raised any concern with him regarding the admissibility of the same during trial. (Exhibit "G" at 91-93, Testimony of Jamal Ezell).

20.     At no time prior to the start of trial did defense counsel inquire of the Government whether it intended to introduce into evidence at trial any bad act evidence against the Defendant. (Exhibit "G" at 25, Testimony of Christopher Warren, Esquire).

21.     At no time did defense counsel file a motion to prohibit the Government from referring to the Defendant's prior record. (Exhibit "G" at 24-25, Testimony of Christopher Warren, Esquire).

22.     At no time prior to nor during the trial did the Government ever serve the Defendant with notice of its intention to use bad act evidence pursuant to Rule 404(b) of the Federal Rules of

Evidence, in the nature of the Defendant having a prior arrest, conviction or prison record. (Exhibit "G" at 24-25, 29, Testimony of Christopher Warren, Esquire).

23. On May 5, 2005, day four of the trial, the Government called as a witness Detective Donald Beese of the Upper Darby Township Police Department. Detective Beese testified that he received information from the Abington Police Department that the Defendant, Jamal Ezell, may be a "third" suspect in the robbery of the ABC Auto Parts Store in Upper Darby, Pennsylvania, on March 5, 2002. (Exhibit "D," Tr. May 5, 2005, p. 16).

24. Detective Beese was invited by the Government to testify regarding how he developed a photo spread to show to victims, which included the photo of the Defendant. On direct examination, the Government developed evidence that the Defendant's photograph was in the Philadelphia Police Department database, implying that the Defendant had a prior police record. There was no objection to this testimony. (Exhibit "D," Tr. May 5, 2005, p. 16); (Exhibit "G" at 15-16, Testimony of Christopher Warren, Esquire). Defense counsel knew at the time that the reference to the Philadelphia Police Department database was a reference to individuals that have been arrested and photographed by the Philadelphia Police Department, and that Detective Beese was identifying the Defendant's photograph as coming from that database. (Exhibit "G" at 17, Testimony of Christopher Warren, Esquire).

25. Further, the Government called Detective Robert Geary, a Philadelphia Police Detective, who was involved in investigating the robbery of the Wine and Spirits Shop at 1100 S. Delaware Avenue. (Exhibit "D," Tr. May 5, 2005, pp. 22-23). Detective Geary read one of the alleged confessions of the Defendant, and he identified a photo spread shown to witnesses regarding the robbery of the Delaware Avenue Wine and Spirits Shop. (Exhibit "D," Tr. May 5, 2005, pp. 25-26). At this point, the jury had already heard the source of the photo.

26.     Next the Government called Detective James Godby of the Upper Merion Township Police Department. (Exhibit "D," Tr. May 5, 2005, pp. 39-40). Detective Godby, under questioning by the Government, explained how photo spreads are developed. He explained that they are created from a database going back approximately 5 years, which database includes anyone who was arrested in Pennsylvania. (Exhibit "D," Tr. May 5, 2005, p. 44). Godby further testified that a photo spread was developed regarding the Defendant using the same criminal database he described, thereby clearly advising the jury that the Defendant had suffered prior arrests, and possibly convictions, in Pennsylvania. (Exhibit "D," Tr. May 5, 2005, pp. 45-51). Attorney Warren did not object to this testimony. (Exhibit "G" at 21, Testimony of Christopher Warren, Esquire).

27.     Godby further explained that he had a first name being *Jamal,* and that he searched all of the Jamals who were arrested in Pennsylvania from the same database. (Exhibit "D," Tr. May 5, 2005, pp. 46-47).  Attorney Warren did not object to this testimony. (Exhibit "G" at 21, Testimony of Christopher Warren, Esquire).

28.     Defense counsel conceded at the hearing on the Motions that the Government's question to Godby was limited to what is a photo spread and what does it consist of. The Government's question did not go to how the specific photo spread in this case was developed. (Exhibit "G" at 19, Testimony of Christopher Warren, Esquire). However, defense counsel testified that in response to the Government's limited question "the witness was allowed to explain that pictures or individuals who are in these photo spreads are people who have been arrested in Pennsylvania within the last five years..." (Exhibit "G" at 20, Testimony of Christopher Warren, Esquire).  Defense counsel further conceded that this testimony communicated directly to the jury that the Defendant had an arrest record, (Exhibit "G" at 20-21, Testimony of Christopher Warren, Esquire), and that this point was "snuck in" by Detective Godby and constituted bad act evidence as defined by Rule 404(b). (Exhibit "G" at 83, Testimony of

7

Christopher Warren, Esquire). Yet, no curative or limiting instruction was requested by defense counsel. (Exhibit "G" at 21-22, 24, 83, Testimony of Christopher Warren, Esquire).

29.     The Detective further testified that after he was able to identify Jamal Ezell as a subject, he made arrangements to have the Defendant brought in "from the Philadelphia Prison System." There was no explanation as to why the Defendant was in the "Philadelphia Prison System." There was no objection to any of this testimony, and no curative or limiting instruction was requested by defense counsel. (Exhibit "D," Tr. May 5, 2005, p. 51); (Exhibit "G" at 28-29, Testimony of Christopher Warren, Esquire).

30.     While defense counsel testified at the hearing that he believed the testimony about the "Philadelphia Prison System" related to the Defendant being recently arrested by the Philadelphia Police Department regarding the robbery charges, he testified that *he did not know what the jury believed regarding the reference to the prison system*:

> Q:     Well, my ... question to you is you may have known that, but did the jury know that?
> A:     I can't tell you what the jury knew or didn't know...

(Exhibit "G" at 29-30, Testimony of Christopher Warren, Esquire).

31.     Defense counsel eventually conceded that this testimony constituted bad act evidence and was objectionable, but that as a strategy, he voluntarily chose not to object nor to request limiting instructions from the Court so as not to highlight the testimony. (Exhibit "G" at 30-32, 34-35, Testimony of Christopher Warren, Esquire). However, even though he knew of his client's prior record as set forth above, defense counsel also conceded that he never thought to approach the Government in advance to ensure that references to any prior arrests or incarcerations of the Defendant were not mentioned unnecessarily during the course of the trial. (Exhibit "G" at 33, Testimony of Christopher

Warren, Esquire). I also find that defense counsel also took no such action after the first reference which implied that the Defendant may have experienced prior arrest.

32.     Defense counsel also testified at the hearing that, knowing that this evidence was prejudicial to the defendant, he conducted his own Rule 404(b) analysis and sided with the Government in determining that this evidence was admissible. (Exhibit "G" at 30, 83 Testimony of Christopher Warren, Esquire).

33.     In addition, on cross examination, defense counsel himself pointed out that the Defendant was in custody in Philadelphia when Detective Godby brought him into Montgomery County to face charges. (Exhibit "D," Tr. May 5, 2005, p. 63).

34.     At no time, either pretrial or during the trial, did the Defendant contest the identification of his photograph as being among the photo spreads which were shown to the witnesses. (Exhibit "G" at 31, Testimony of Christopher Warren, Esquire). Defense counsel conceded that as a result, it was totally unnecessary for the Government to elicit testimony regarding the source of the photographs of the Defendant. (Exhibit "G" at 31-32, Testimony of Christopher Warren, Esquire).

35.     This testimony could clearly have led the jurors to assume or conclude that the Defendant suffered prior arrests, possibly prior convictions, and that he was then currently imprisoned.

36.     There was no objection to any of this testimony by defense counsel.

37.     No limiting or curative instruction was ever requested of the Court by defense counsel regarding this testimony.

B.      Claim that Defense Counsel Presented Ineffective Opening and Closing Arguments

38.     During his opening statement, defense counsel initially argued presumption of innocence (Exhibit "B," Tr. May 3, 2005, p. 24); the doubtful credibility of alleged co-conspirators Eric Mitchell and Eric Jewel (Exhibit "B," Tr. May 3, 2005, p. 25-27); the concept of reasonable doubt

(Exhibit "B," Tr. May 3, 2005, p. 27-29); and the possibility of misidentifications (Exhibit "B," Tr. May 3, 2005, p. 27); (Exhibit "G" at 35-36, Testimony of Christopher Warren, Esquire).

39.     However, defense counsel in his opening and in his closing arguments essentially ineffectively conceded the guilt of the Defendant.

40.     In the opening statement, while outlining the jurisdictional defense, defense counsel admitted that the Defendant had committed the charged robberies. (Exhibit "B," Tr. May 3, 2005, p. 29-30); (Exhibit "G" at 36-37, Testimony of Christopher Warren, Esquire).

41.     In defense counsel's closing argument, he essentially argued to the jury that the Defendant confessed to the crimes with which he was charged when in state custody:

> You heard about it. We talked about it with these confessions, he was arrested and charged in State Court, he came in, confessed in State Court. This is exactly what was happening to him until Mitchell and Jewell got picked up by the feds and said uh oh, uh oh, 710 years? Not good anymore.

(Exhibit "E," Tr. May 6, 2005, pp. 53-54); (Exhibit "G" at 37-39, Testimony of Christopher Warren, Esquire). This position was contrary to that taken by the Defendant pretrial, which was that the confessions were voluntary, and therefore, was inadmissible.[1] (Exhibit "G" at 39-40, Testimony of Christopher Warren, Esquire).

42.     Then, the Government in rebuttal emphasized the same point made by defense counsel, being that the jury had the benefit of the Defendant's confession. (Exhibit "E," Tr. May 6, 2005, pp. 67-69).

---

[1] On September 29, 2003, the Defendant filed a Motion to Suppress the confession. (Document #40). A hearing on the matter was held on July 30, 2004. (Docket, Documents 82 and 92). The Court denied the Motion on August 31, 2004, which Order was docketed on September 2, 2004 (Docket, Document 106).

43.     To emphasize to the jury that the Defendant confessed to the crimes charged, is the role of the prosecution, and there is no reasonable basis for defense counsel to emphasize this point, particularly when said confession was challenged pretrial. (Exhibit "E," Tr. May 6, 2005, pp. 53-54).

44.     Defense counsel conceded at the hearing that, by his reemphasis of the Defendant's confessions to some of the robberies, that he joined the Government in reminding the jury that the Defendant had confessed to the robberies. (Exhibit "G" at 40-41, Testimony of Christopher Warren, Esquire).

45.     Although the Court ruled as a matter of law the confession could be introduced into evidence by the Government, defense counsel could have, but never argued factually to the jury that the confessions were unreliable. (Exhibit "G" at 39-40, Testimony of Christopher Warren, Esquire).

46.     In defense counsel's closing argument, he all but conceded that the Defendant was guilty. While he initially attacked the credibility of the two co-conspirators, during trial and during his closing argument, he also advised the jury during the same closing argument that he wasn't saying that the co-conspirators were totally without belief, but that they had merely embellished the role of the Defendant in these crimes.  (Exhibit "E," Tr. May 6, 2005, pp. 45-50). He thereby supported the credibility of the two co-conspirators confirming the Defendant's guilt:

> Q.     Well by embellishing his role means that he played a role.
>         They're just making it a little bigger than it was, correct?
> A.     Yeah.

 (Exhibit "G" at 44-45, Testimony of Christopher Warren, Esquire).

47.     As noted above, defense counsel, at some point, attacked the credibility of the two co-conspirators, which could possibly raise a reasonable doubt among the jurors. Competent counsel would have argued "False in One, False in All (*Falsus in Uno, Falsus in Omnibus*)." (Model Criminal Jury Instruction for the Court of Appeals for the Third Circuit §4.26). However, by later supporting the

credibility of the two co-conspirators by stating that he was not stating that they were totally without belief, but they engaged in embellishment, defense counsel communicated to the jury his belief in the Defendant's guilt. ((Exhibit "E," Tr. May 6, 2005, pp. 45-50).

48.     At various times during his testimony at the hearing, defense counsel explained that his strategy at times, in conceding his client's role in the robberies, was in part to avoid the introduction into evidence of an off-the-record proffer given by the Defendant to the Government. (See for example: Exhibit "G" at 46-47, Testimony of Christopher Warren, Esquire). He expressed concern that if he attacked the credibility of the Government's key witnesses, the proffer would be admissible into evidence. However, the record establishes that defense counsel did attack the credibility of the co-conspirators and other key witnesses for the Government. (See for example: Exhibit "G" at 48-50, Testimony of Christopher Warren, Esquire, regarding his attack of the credibility of witness Sweitzer).

49.     During his closing argument, while arguing jurisdiction, defense counsel also conceded the guilt of the Defendant by arguing that, were the jury to find the Defendant not guilty, they would not be saying that he is innocent of committing the robberies, but they would be saying send the case back to state court where it belongs. (Exhibit "E," Tr. May 6, 2005, pp. 55); (Exhibit "G" at 51-53, 126, Testimony of Christopher Warren, Esquire).

50.     At several times during his testimony at the hearing, defense counsel indicated that he essentially admitted the factual guilt of the Defendant to remain credible with the jury, while emphasizing to them that his client did not deserve 132 years in prison: "What I saw all … the only possibility that he could possibly avoid the 132 years sentence is if the jury believed that was way too much time for six armed robberies and they also believed that he would not get off Scott free. That was the point of the argument."  (Exhibit "G" at 53, Testimony of Christopher Warren, Esquire). However, the jury was never informed of the potential prison time faced by the Defendant.

51.     Through this closing argument, consistent with his opening statement, defense counsel admitted the Defendant's guilt to the jury, but requested jury nullification which was completely contrary to the charge given by the Court, which was limited to determining whether or not the Government met its burden of proof.

52.     Through this closing argument, defense counsel advised the jury that the Government had met its burden of proof, that the Defendant committed the robberies.

53.     In presenting an effective opening statement, defense counsel will advise the jury of the relief he or she will request after all of the evidence is in, i.e., a verdict of not guilty. That did not happen during defense counsel's opening statement in this case.  (Exhibit "B," Tr. May 3, 2005, p. 29-30).

54.     In presenting an effective closing statement, defense counsel is required to request specific relief from the jury, i.e., a verdict of not guilty. Here, defense counsel completely failed to ask the jury for a verdict in favor of the Defendant, further implying his belief in the Defendant's guilt:

> The last thing I want to say to you is this: I thank you very much for your time. I spoke longer than I thought I would. Your deliberations are sacrosanct, okay? When you go through that door they are secret. They are private. Nobody, and I mean nobody, can inquire into what you guys say, why you reached the decision you reached, it's yours. Thank you very much.

(Exhibit "E," Tr. May 6, 2005, pp. 59).

55.     During the hearing, defense counsel not only admitted that he did not request relief from the jury for the Defendant, such as a verdict of not guilty, he testified that he never does so:

> Q.     All right. Would you turn to page 59, still within Exhibit E? And as a trial lawyer, whether it's a civil case or a criminal case, isn't it customary when you close… in your closing argument to the jury to tell them what you want them to do?
> A.     No.
> Q.     Oh, it's not customary?
> A.     It's not my custom.

(Exhibit "G" at 55-56, Testimony of Christopher Warren, Esquire).

56.     The overall effect of trial counsel's closing argument was to communicate to the jury that they had no choice but to return a verdict of guilty against the Defendant. At the conclusion of defense counsel's closing argument, there was no plea made to the jury to find the Defendant not guilty. (Exhibit "G" at 56-57, Testimony of Christopher Warren, Esquire).

57.     Most significant of all is the failure of defense counsel to advise the jury that they had a choice, that choice being to enter a verdict of not guilty in favor of the Defendant. (Exhibit "E," Tr. May 6, 2005, pp. 59). As such, the jury was left with one choice, that which was provided by the Government. See: (Exhibit "E," Tr. May 6, 2005, p. 73, conclusion of the Government's rebuttal argument by Assistant United States Attorney Jeffery Whitt).

C.     Claim that the Defendant was Denied his Right to Effective Assistance
       of Counsel During the Plea Bargaining Process

58.     During the course of pretrial proceedings in this matter, the Defendant was made aware that, if he went to trial and was convicted on all counts, he would be facing approximately 132 years in prison. (Exhibit "G" at 57, Testimony of Christopher Warren, Esquire); (Exhibit "G" at 96, Testimony of Jamal Ezell). As a result, the Defendant authorized defense counsel to engage in plea bargaining with the Government. (Exhibit "G" at 57-58, Testimony of Christopher Warren, Esquire); (Exhibit "G" at 97, Testimony of Jamal Ezell).

59.     At some point, defense counsel, and even the Government directly, indicated to the Defendant that he could possibly receive a plea agreement offer whereby the Defendant would face approximately 32 years in prison as opposed to 132 years in prison. Admittedly, the Defendant, then 26 years of age, was reluctant to accept 32 years in prison and reach age 58 before he was released from prison. (Exhibit "G" at 58-59, Testimony of Christopher Warren, Esquire). However, merely being

informed of a potential plea offer, and a defendant's rejection of it does not end the inquiry regarding effective assistance.

60.      The Defendant contends here that he was denied the right to make a reasonably informed decision whether to accept a plea offer, due to Defense counsel's ineffective representation during plea negotiations, and that this resulted in the Defendant's decision to reject the plea offer, proceed to trial and receive a sentence of 132 years in prison.

61.      Even though the Defendant had indicated to his counsel that he was willing to consider entering into a plea agreement with the Government, at no time did defense counsel obtain a written plea offer from the Government for his consideration. Therefore, the Defendant never saw an actual proposed plea offer in writing. (Exhibit "G" at 60, Testimony of Christopher Warren, Esquire); (Exhibit "G" at 97, Testimony of Jamal Ezell).

62.      On several occasions, defense counsel was asked by the Defendant to assess the chances of being victorious at trial based upon the evidence against the Defendant. In response, and on several occasions, defense counsel advised the Defendant that in his view, the robberies had no effect on interstate commerce, and therefore, there was no jurisdiction in federal court for either the robbery charges or for the gun charges, and that he believed there was a chance to have the case sent back to state court. (Exhibit "G" at 96, Testimony of Jamal Ezell). During the hearing on April 30, 2015, defense counsel confirmed that he proposed this strategy to the Defendant. (Exhibit "G" at 61-63, 126-127, Testimony of Christopher Warren, Esquire).

63.      As noted, knowing that the Defendant's primary issue with the proposed plea agreement was spending 32 years behind bars, counsel advised the Defendant that he believed that there was a good chance that he could have the prosecution "sent back to state court" where the Defendant would be facing considerably less time in prison than if he were convicted in federal court. (Exhibit "G" at 63,

Testimony of Christopher Warren, Esquire). Indeed, defense counsel pursued a motion to dismiss due to selective prosecution on this basis, (Exhibit "G" at 63-64, Testimony of Christopher Warren, Esquire).

64.     The Defendant's testimony is also corroborated by the fact that defense counsel pursued this same theory at trial, presenting it to the jury in both his opening and the closing statements, arguing that no federal crime was committed, and that the case belonged back to state court. (Exhibit "E," Tr. May 6, 2005, pp. 55, Lines 2-6).

65.     During these discussions, defense counsel also advised the Defendant of the unfairness of prosecuting him in federal court, specifically naming other co-conspirators who the Government "permitted" to plead to local charges. (Exhibit "G" at 93-96, Testimony of Jamal Ezell).

66.     The Presentence Investigation Report at page 2 reports that two co-conspirators were prosecuted locally. They are Alfonso Holder, a.k.a. "Bum," and Angelo Hall, a.k.a. "Cheese." They were not charged or prosecuted federally. Alfonso Holder was involved in the robbery which occurred on March 10, 2002. He pled guilty to robbery in the Montgomery County Court of Common Pleas on March 22, 2004, and he was sentenced to 1& 1/2 years to 3 years in prison. Angelo Hall was involved in one robbery held on March 19, 2002 and pled guilty to robbery in the Montgomery County Court of Common Pleas. On January 31, 2003, he was sentenced to 5 to 10 years in prison. (See Presentence Investigation Report).

67.     I find that the Defendant's decision-making was further hindered by the fact that defense counsel failed to share with the Defendant all of the relevant discovery provided to defense counsel prior to the actual trial.

68.     At the trial of this case, the Government introduced into evidence Exhibits G-1 to G-40 as listed on Exhibit "F" to Counsel's Amended Motion Pursuant to §2255.

69.     Prior to trial, defense counsel only shared with the Defendant Exhibits G-23 (Upper Merion Township Police Photo Array), G-24 (Philadelphia Police Department Photo Array), G-31 (Statement of Jamal Ezell dated 5/17/02), G-32 (Upper Merion Township Police Department Miranda Rights, signed by Jamal Ezell dated 5/30/02), G-36 (Philadelphia Police Department Photo Array-P. Lewis), G-37 (Philadelphia Police Department Photo Array-K. Smalls), G-38 (Jewel Plea Agreement) and G-39 (Michel Plea Agreement).  (Exhibit "G" at 98-99, Testimony of Jamal Ezell).

70.     Other than those exhibits, defense counsel failed to share the other critical discovery with the Defendant until trial. This included two critical video tapes which defense counsel never viewed with the Defendant. (Exhibit "G" at 120-121, Testimony of Christopher Warren, Esquire).

71.     The Defendant testified at the hearing that had he seen all of the exhibits that the Government had planned to introduce into evidence against him at trial, including videotape evidence, that he would've accepted the proposed plea agreement for 32 years in prison. (Exhibit "G" at 99-100, 106-108, 116-117, Testimony of Jamal Ezell). I find this testimony to be credible.

72.     As a result of defense counsel's failure to share with the Defendant critical discovery, the Defendant was hindered in his ability to fully evaluate the Government's case against him in determining whether or not to enter a plea of guilty pursuant to a plea bargain with the Government.

73.     In addition, by relying on his counsel's assessment of the case, that there was a clear opportunity for victory, the Defendant decided not to accept a potential plea offer of 32 years in prison, and to proceed to trial:

> Q.     Why would you do that? When you're facing 132 years, what made you reject that type of offer?
>
> A.     Well, what happened was when Warren came with the 32 years, and he said I didn't have to cooperate or nothing, I asked Warren… I asked Warren did I have any chance at all. And Mr. Warren told me, he said I think… He said I've been thinking and I

17

think that I probably can get this case sent back to the state. And
when Mr. Warren said that, I was actually thinking about taking
the plea. I was going to take the plea. But when Mr. Warren said
that, I thought about it because in state court, I would only get a
sentence of… Well, in state, I was offered 6 to 15 years. So I
know anywhere in that range, I would get that kind of sentence.
And compared to 30 years, I decided to reject the offer.

(Exhibit "G" at 98, Testimony of Jamal Ezell).

74.     At trial, defense counsel pursued an interstate commerce defense, which he

recommended to the Defendant, which was contrary to the clear state of the law. The record also

reflects that defense counsel knew that the interstate commerce defense that he was pursuing was

contrary to the clear state of the law.[2]

75.     At the evidentiary hearing, the Defendant established that defense counsel (a) failed to

obtain from the Government a proposed written plea agreement; (b) failed to share with the Defendant

critical discovery prior to proposing a plea agreement for the Defendant's consideration; (c) advised the

Defendant that he could possibly defeat the Government's efforts to convict him beyond a reasonable

doubt based on an interstate commerce defense which was not supported by law.

76.     At the evidentiary hearing, the Defendant credibly testified that the outcome of the plea

process would have been different if he had received competent advice during plea negotiations and

regarding the viability of the proposed defense. (Exhibit "G" at 99-100, 106-108, 116-117, Testimony

of Jamal Ezell).

---

[2] Discussed more fully in Proposed Findings of Fact Section, III(D) below.

D.      Claim that Defense Counsel Pursued a Jurisdictional Defense
        which he knew was Contrary to the Law

77.     As noted in Section C above, defense counsel advised the Defendant that he believed he could have the case dismissed and transferred to state court based on a jurisdictional defense to all of the charges.

78.     The evidence at trial as presented by the Government indicated that during a two-week period beginning on March 2, 2002, the Defendant and several others participated in the armed robbery of six different establishments in Philadelphia and Montgomery Counties. Counsel's Amended Motion, Exhibits "A" through "E."

79.     The patterns of these robberies were essentially the same. Two or three men would enter the establishments when few or no customers were in the establishments, and upon entering, one of the three would display a firearm and announce the robbery. The victims were then bound with either duct tape or some other form of restraint, and money and sometimes merchandise, was taken. Counsel's Amended Motion, Exhibits "A" through "E."

80.     To establish the element of an effect upon interstate commerce, the Government called witnesses related to each establishment that was robbed who generally testified that each of the stores and businesses obtained goods and services which were transported in interstate commerce, and that during the robberies, money and/or merchandise was taken. Counsel's Amended Motion, Exhibits "A" through "E."

81.     The Government also called co-conspirators Jewell and Mitchell as witnesses, and they described in detail the manner in which the robberies were committed and the Defendant's alleged role in each of the offenses. The Government also called several of the victim employees and they testified

as to what occurred during each of the robberies and the fear that they experienced at the time the offenses were committed. Counsel's Amended Motion, Exhibits "A" through "E."

82.    The trial transcripts reveal that the Defendant's only defense presented at trial was that interstate commerce was not affected by any of the six robberies since the robbers, by specific design, robbed each of the victim commercial establishments when there were no customers inside transacting business. In other words, that the Government was required to prove that commercial transactions with customers were interrupted in order to satisfy the jurisdictional element of effect upon interstate commerce. (Exhibit "G" at 67-68, Testimony of Christopher Warren, Esquire).

83.    Defense counsel proposed this defense to the jury during his opening statement. (Exhibit "B," Tr. May 3, 2005, pp. 24-30). Counsel argued that the robberies were planned at the end of the day when people would not be shopping or using the vendor services, which would negate an effect on interstate commerce. (Exhibit "G" at 67-68, Testimony of Christopher Warren, Esquire)).

84.    Defense counsel made the argument that the jury should send the case back to state court, which echoes the plan he outlined to the Defendant pretrial. (Exhibit "B," Tr. May 3, 2005, pp. 27-30).

85.    The Government questioned certain victim-witnesses to establish the interstate nexus, while defense counsel consistently pursued this *no customer activity* defense during his cross-examination of victim-witnesses:

    a.    <u>Trial Day 2, May 3, 2005</u>

        (1)    Cross-examination of Jeffrey Stepp (Exhibit "B," Tr. May 3, 2005, pp. 57-60);
        (2)    Cross-examination of Neil Johnson (Exhibit "B," Tr. May 3, 2005, pp. 76-78);
        (3)    Cross-examination of James J. Pomante (Exhibit "B," Tr. May 3, 2005, pp. 92-95);

(4)     Cross-examination of Rahman Warfield (Exhibit "B," Tr. May 3, 2005, pp. 107-110);

(5)     Direct and Cross-examination of Robert Koons,

        Direct: (Exhibit "B," Tr. May 3, 2005, pp. 110-114);
        Cross:  (Exhibit "B," Tr. May 3, 2005, pp. 114-115);

(6)     Cross-examination of Lisa Morasco (Exhibit "B," Tr. May 3, 2005, pp. 152-155);

(7)     Direct and cross-examination of Tod McKenna

        Direct: (Exhibit "B," Tr. May 3, 2005, pp. 156-159);
        Cross: (Exhibit "B," Tr. May 3, 2005, pp. 159-160);

(8)     Cross-examination of Pauletta Lewis (Exhibit "B," Tr. May 3, 2005, pp. 180-182);

(9)     Cross-examination of Kenneth Smalls (Exhibit "B," Tr. May 3, 2005, pp. 198-200);

(10)    Direct and Cross-examination of Guy Stuart

        Direct: (Exhibit "B," Tr. May 3, 2005, pp. 201-207);
        Cross:  (Exhibit "B," Tr. May 3, 2005, pp. 207-208);

(11)    Cross-examination of Toby Daniel Parker (Exhibit "B," Tr. May 3, 2005, pp. 228-231);

(12)    Cross-examination of Annie James Mincey (Exhibit "B," Tr. May 3, 2005, pp. 247-248);

(13)    Direct and cross-examination of Dale Teruya

        Direct: (Exhibit "B," Tr.  May 3, 2005, pp. 249-255);
        Cross:  (Exhibit "B," Tr. May 3, 2005, pp. 255-259).

b.      Day 3, May 4, 2005

(1)     Cross-examination of Kenneth Sheridan (Exhibit "C," Tr. May 4, 2005, pp. 8-10);

(2)     Cross-examination of Marlo Speed (Exhibit "C," Tr. May 4, 2005, pp. 23-24);

(3)     Cross-examination of William Clothier (Exhibit "C," Tr. May 4, 2005, pp. 30-34)

(4)     Direct and cross-examination of Angela Bock

Direct: (Exhibit "C," Tr. May 4, 2005, pp. 52-55);
Cross: (Exhibit "C," Tr. May 4, 2005, pp. 56-58);

(5)    Eric Mitchell-co-conspirator

Direct: (Exhibit "C," Tr. May 4, 2005, pp. 167-204);
Cross: (Exhibit "C," Tr. May 4, 2005, pp. 204-223).

86.    During his closing argument to the jury, defense counsel argued that if there were no customers in the store at the time of the robberies, the victims were not engaged in interstate commerce, and therefore, there was no federal jurisdiction. (Exhibit "E," Tr. May 6, 2005, pp. 55-59). Counsel knew that this was not a correct statement of the law.

87.    Defense counsel found no case law to support this theory. (Exhibit "G" at 68, 76, Testimony of Christopher Warren, Esquire).

88.    During the charging conference, defense counsel conceded that the state of the law regarding an effect on interstate commerce in the Third Circuit was governed by United States v. Urban, 404 F3d 754 (3rd Cir. 2005). (Exhibit "D," Tr. May 5, 2005, p. 89); (Exhibit "G" at 68-69, Testimony of Christopher Warren, Esquire). One of the essential holdings in that case was that where the resources of an interstate business are depleted or diminished in any manner by a prohibited act such as robbery or extortion, the consequent impairment of ability to conduct an interstate business is sufficient to satisfy the interstate commerce jurisdictional requirement of the Hobbs Act. Id. at 763-764.

89.    During the Rule 29 argument, defense counsel conceded that the theory he pursued regarding interstate commerce was not consistent with the current state of the law, and that there was no support in the law for the jurisdictional defense he was pursuing on behalf of the Defendant. (See Exhibit "D," Tr. May 5, 2005, p. 69, Lines 22-25; p. 70, 1-25); (Exhibit "G" at 69, Testimony of Christopher Warren, Esquire).

90.     During conferences with the Court, including during the charge conference, defense counsel admitted that there was no support in the law for the jurisdictional defense he was pursuing on behalf of the Defendant. (Exhibit "D," Tr. May 5, 2005, pp. 70-71).

91.     Defense counsel imposed no objection to the jury charge proposed by the Court, which essentially rendered the defense presented during the trial a nullity, and failed to preserve any issue regarding the charge for appeal. (Exhibit "D," Tr. May 5, 2005, pp. 71-81); (Exhibit "E," Tr. May 6, 2005, p. 3).

92.     Defense counsel failed to present to the Court any argument, alternative proposed charge or legal authority on the interstate commerce issue, which would support his defense theory, or establish a record from which an appellate court could possibly make new law. (Exhibit "G" at 70, Testimony of Christopher Warren, Esquire).

93.     Defense counsel's jurisdictional defense prompted the Government in rebuttal to refer to it as "ridiculous" and "absurd." (Exhibit "E," Tr. May 6, 2005, pp. 64-65). The resulting verdict, a conviction on all counts, indicated that the jury agreed with the Government's assessment of this defense.

94.     Defense counsel filed an appeal with the Court of Appeals for the Third Circuit on behalf of Mr. Ezell. (Exhibit "G" at 70-71, Testimony of Christopher Warren, Esquire).

95.     In said appeal, defense counsel did not pursue the *no customer activity* defense, by arguing that this was or should be the law. On the contrary, defense counsel filed a brief pursuant to Anders v. California, 386 US 738 (1968), arguing that he be permitted to withdraw from the case because the appeal did not present any non-frivolous issues for review. (Exhibit "G" #1, at 70 Testimony of Christopher Warren, Esquire).

E.  <u>Claim that Defense Counsel's Overall Performance Denied the Defendant a Fair Trial</u>

96.  The Defendant contends that defense counsel's overall performance as set forth in the above facts, which are incorporated by reference herein, in combination, undermined the adversarial nature of the trial process such that the Defendant was denied effective assistance of counsel during trial.

97.  I find that this was a very difficult case for the Defendant to defend based upon the nature and amount of evidence available to the Government. Nevertheless, difficult cases have been won when a defendant was afforded effective assistance of counsel.

98.  I also find that there is no opportunity whatsoever to present an effective defense to the Government's evidence when the defendant has no advocate. This occurs when the attorney for the defendant fails to advocate on behalf of his client and at times even crosses the line and joins the prosecution.

99.  Based on the record before me, I find that defense counsel: (a) essentially conceded the Defendant's guilt during opening and closing statements; (b) failed to assist his client to make an informed decision at the plea bargaining stage of this case, as an example, by failing to review all discovery with the Defendant prior to trial, and by recommending a defense to the Defendant which had no foundation in law; (c) pursued this same defense; (d) repeatedly failed to object to irrelevant and prejudicial bad act evidence without just cause; (e) joined the Government by reemphasizing damaging evidence against the Defendant, such as his confessions; and (f) failed to advocate for his client by requesting relief from the jury on behalf of the Defendant during his closing argument.

100.  Based on these facts, I find that the Defendant was left without a true advocate throughout the course of the entire trial.

<u>PROPOSED CONCLUSIONS OF LAW</u>

I.     <u>PROCEDURAL HISTORY</u>

1.     The Defendant's Pro Se Motion and Counsel's Amended Motion were filed pursuant to Title 28 United States Code, § 2255, which in part provides as follows:

> (a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

2.     The Motions filed by the Defendant and Counsel state claims which are cognizable within § 2255.

3.     The Defendant's direct appeals ended on December 1, 2008, when his Petition for a Writ of Certiorari to the United States Supreme Court was denied. On November 20, 2009, the Defendant timely filed his Pro Se Motion pursuant to Title 28 U.S.C. § 2255, to set aside and correct the sentence imposed by the Court on March 3, 2006. See Title 28 U.S.C. § 2255(f).

4.     On September 17, 2013, Attorney Weaver filed Counsel's Amended Motion and Memorandum of Law pursuant to Title 28 U.S.C § 2255. (See Docket, Document 225). The claims in the original Pro se Motion and in the Amended Motion are tied to a common core of operative facts, and therefore, the claims in the Amended Motion relate back to the original Pro se Motion. <u>Mayle v. Felix</u>, 545 U.S. 644, 125 S. Ct. 2562 (2005); <u>Hodge v. United States</u>, 554 F. 3rd 372, 377 (3d Cir. 2009); <u>United States v. Thomas</u>, 221 F.3d 430 (3d Cir. 2000).

5.     Subsection 2255(b) provides in part as follows:

> (b) Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

6.     The motions, files and records of the case did not conclusively show that the Defendant was entitled to no relief. Therefore, this Court was duty-bound to cause notice of the Motions to be served upon United States Attorney and to grant the Defendant a prompt hearing regarding said Motions. Said hearing was held on April 30, 2015.

7.     The relief available under § 2255, as provided in § 2255(b), is broad as it includes: (1) vacating of the judgment; (2) discharging the prisoner; (3) resentencing; (4) correcting the sentence; (5) or granting a new trial.

II.     LEGAL PRINCIPLES - CONSTITUTIONAL RIGHT TO ASSISTANCE OF COUNSEL

8.     The 6th Amendment to the United States Constitution provides as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

9.     The right to assistance of counsel is guaranteed by the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the United States Supreme Court, and it cannot be denied to a defendant absent intentional and actual waiver. Johnson v. Zerbst, 304 U.S. 458, 462, 58 S. Ct. 1019 (1938).

10.     The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled. Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063 (1984); Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 276 (1942).

11.     Just having a lawyer present at trial for the accused, however, is not enough to satisfy

the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel

because it envisions counsel playing a role that is critical to the ability of the adversarial system to

produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed,

who plays the role necessary to ensure that the trial is fair, Strickland v. Washington, 466 U.S. at 685,

and for that reason, the Court has recognized that "the right to counsel is the right to the effective

assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970); Strickland, 466 U.S.

at 686, 104 S.Ct. at 2063-64.

12.     The Court of Appeals for the Third Circuit has mandated that claims of ineffective

assistance of counsel be evaluated using the two-pronged test set forth in Strickland v. Washington. To

succeed on such a claim, the petitioner must demonstrate (1) that counsel's performance was deficient,

in that it fell below an objective standard of reasonableness, and (2) that the petitioner suffered

prejudice as a result of the deficiency. Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011).

13.     In establishing this two-part test, in Strickland v. Washington, United States Supreme

Court laid down a simple yardstick for determining whether or not a defendant was denied effective

assistance of counsel:

> The benchmark for judging any claim of ineffectiveness must be whether
> counsel's conduct so undermined the proper functioning of the adversarial
> process that the trial cannot be relied on as having produced a just result.

Id., 466 U.S. at 686, 104 S.Ct. at 2064.

14.     As noted above first, the petitioner must show that his lawyer's performance was

deficient by identifying counsel's "acts or omissions" that were outside the bounds of "reasonable

professional judgment." Strickland, 466 U.S. at 688, 690. The Court must decide whether the acts or

omissions "were outside the wide range of professionally competent assistance." Id. at 690. The Court

judges counsel's performance based on the case-specific facts, viewed as of "the time of counsel's conduct." Id. Under this first prong, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158 (1955) ).

15. Second, a petitioner must show "that the deficient performance prejudiced the defense," meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial" with a reliable result. Id. at 687. A petitioner must therefore show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." Id. at 669. Stated differently, there will be an award of relief if the petitioner affirmatively establishes the likelihood of an unreliable verdict. McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir. 1993).

16. The essence of defense counsel's Sixth Amendment role in representing his or her client is to be an advocate for the client within the adversarial system, which helps to ensure a fair trial. A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled. Strickland, 466 U.S. at 685, 104 S.Ct. at 2063.

17. A defendant is denied his right to a fair trial through ineffective assistance of counsel if defense counsel ceases to advocate for the defendant, and at times, in essence crosses the line and even joins the cause of the Government. Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55(1932); Strickland, 466 U.S. at 688, 104 S.Ct. at 2065.

18.     Normally, claims that were never raised on direct appeal are considered barred from collateral review. However, because an ineffective assistance of counsel claim often relies on matters outside of the factual record on appeal, and the defendant is often represented on appeal by the same counsel as at trial, courts have held that "an ineffective assistance claim which was not raised on direct appeal is not deemed procedurally defaulted for purposes of habeas review." United States v. Garth, 188 F.3d 99, 107 n.11 (3d Cir. 1999) (citing United States v. DeRewal, 10 F.3d 100, 103 (3d Cir. 1993).

III.    CONCLUSIONS OF LAW RELATING TO SPECIFIC CLAIMS

        A.     Claim that Defense Counsel Failed to Object to Prejudicial Bad Act Evidence

19.     A defense counsel's failure to object to inadmissible evidence can constitute ineffective assistance of counsel, if such failure to object falls below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. at 688, 104 S.Ct. 2052 (1984), Broaster v. Houtzdale, 2011 U.S. Dist. LEXIS 86832, p. 12 (2011) (DuBois, J.).

20.     Rule 404(b) of the Federal Rules of Evidence provides as follows:

        b) Crimes, Wrongs, or Other Acts.

        (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
        (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
        (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
        (B) do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice.

21.     The evidence solicited by the Government during the trial, that the Defendant's photograph was retrieved from files or databases containing the photographs of individuals who had

been arrested, possibly convicted, and that the Defendant had been brought in from the "Philadelphia Prison System," constituted evidence of crimes, wrongs or other bad acts (prior bad act evidence) within the meaning of Rule 404(b) of the Federal Rules of Evidence.

22.     The Supreme Court established four guidelines for the admissibility of prior bad act evidence pursuant to the Federal Rules of Evidence: (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted. <u>Huddleston v. United States</u>, 485 U.S. 681, 691-92, 108 S. Ct. 1496, 1502 (1988).

23.     I find that this evidence was not admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, being exceptions to the rule of inadmissibility pursuant to Rule 404(b)(2) of the Federal Rules of Evidence.

24.     At no time, either pretrial or during the trial, did the Defendant contest the identification of his photograph as being among the photo spreads which were shown to the witnesses. All the jury was required to learn was that a photograph of the Defendant was included in the photo arrays. Therefore, the evidence regarding the source of the Defendant's photograph was not relevant. See: Rule 402, Federal Rules of Evidence. This evidence was also not relevant for any other purpose sanctioned by Rule 402 of the Federal Rules of Evidence.

25.     I find that this evidence was clearly prejudicial to the Defendant as a matter of law, in that this evidence clearly would tend to established in the minds of the jury that the Defendant suffered prior arrests, possibly prior convictions, and that he was then currently imprisoned. This evidence was particularly prejudicial in this case where the Defendant's alleged co-conspirators admitted to being involved in up to 20 robberies. (Exhibit "C," Tr. May 4, 2005, p. 66-67; testimony of alleged co-

conspirator Eric Jewell). The jury may have been led to believe that the Defendant's prior arrests and/or convictions involved some of the other robberies for which testimony was introduced during the course of the trial with respect to the alleged co-conspirators of the Defendant.

26.     I further find that the probative value of this evidence was greatly outweighed by its prejudicial effect, in that this evidence had no probative value as set forth above. There clearly was no "genuine need" for the evidence. United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir. 1988).

27.     I find that defense counsel's performance with regard to his failure to challenge this evidence fell below the standard of reasonableness, and that the Defendant was prejudiced as a matter of law, for the following reasons:

(a)     defense counsel knew of the Defendants prior record pretrial;

(b)     defense counsel took no steps to determine the Government's intention regarding evidence of the Defendant's prior arrest or convictions, either by inquiry or filing motions;

(c)     defense counsel listened to repeated evidence of this nature from at least three witnesses during the trial, and never objected to the same and never requested a limited or curative instruction of the Court;

(d)     defense counsel testified at the hearing that he did his own self-analysis of this evidence and determined that it was admissible; but his analysis was incorrect and supporting the admissibility of this evidence was the role of counsel for the Government and not of counsel for the Defendant;

(e)     in summary, defense counsel took absolutely no steps to protect the Defendant from the introduction into evidence of irrelevant and prejudicial evidence. Strickland v. Washington, supra; Blystone v. Horn, 664 F.3d 397 (3d Cir. 2011).

28.     I find that there is a reasonable probability that, but for counsel's unprofessional errors in this regard, the result of the proceeding would have been different." Strickland v. Washington at 694.


B.     Claim that Defense Counsel Presented Ineffective Opening and Closing Arguments

29.     The inadequacy of a defense counsel's jury arguments can be the basis for a violation of the Sixth Amendment claim. Smith v. Spisak, 558 U.S. 139, 151, 130 S.Ct. 676, 685 (2010).

30.     A defense attorney should never cross the line to join the prosecution. Compare: Buehl v. Vaughn, 1996 U.S. Dist. LEXIS 19509, p. 107-120 (E.D. Pa., Padova, J.) (opening statement by defense counsel in a murder trial asserting that the perpetrator of the crime should be put to death, was deemed ineffective as undermining counsel's ability to advocate for the defendant at the penalty phase of the trial.).

31.     In defense counsel's arguments to the jury, he essentially admitted that the Defendant was involved in the robberies, highlighted the Defendant's confessions, vouched for the credibility of the two co-conspirators who testified against the Defendant, argued a theory of defense without a legal basis and failed to request relief from the jury.

32.     I find that defense counsel's arguments to the jury were in essence concessions of guilt, leaving the Defendant without an advocate at two of the most critical stages of this adversarial system.

33.     I find that counsel's performance in delivering his arguments to the jury were deficient, in that it fell below an objective standard of reasonableness, that the Defendant suffered prejudice as a result of the deficiency as, but for counsel's arguments, the result of the proceeding would have been different. Strickland, 466 U.S. at 685-690; Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011).

34.     As a result, the Defendant was denied his Sixth Amendment right to effective assistance of counsel as a result of defense counsel's opening and closing arguments to the jury. <u>Smith v. Spisak</u>, 558 U.S. at 151, 130 S.Ct. at 685; <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. at 2065.

C.      Claim that the Defendant was Denied his Right to Effective Assistance
        of Counsel During the Plea Bargaining Process

35.     Defendants have a Sixth Amendment right to counsel, which right extends to the plea-bargaining process. <u>Lafler v. Cooper</u>, 132 S.Ct. 1376, 1384 (2012); <u>Hill v. Lockhart</u>, 474 U.S. 52, 56-57, 106 S. Ct. 366, 369 (1985). Thus, during plea negotiations, defendants are "entitled to the effective assistance of competent counsel." <u>McMann v. Richardson</u>, 397 U. S. 759, 771, 90 S. Ct. 1441 (1970).

36.     A defendant has the right to make a reasonably informed decision whether to accept a plea offer. See <u>Hill v. Lockhart</u>, 474 U.S. 52, 56-57, 106 S. Ct. 366, 369 (1985) (voluntariness of a guilty plea depends on adequacy of counsel's advice); <u>Von Moltke v. Gillies</u>, 332 U.S. 708, 721, 68 S. Ct. 316, 322 (1948); <u>United States v. Day</u>, 969 F. 2d, 39, 43 (3rd Cir 1992).

37.     However, merely informing a defendant of a potential plea offer does not end defense counsel's duty nor the inquiry regarding effective assistance. <u>United States v. Day</u>, 969 F. 2d 39 at 43-45. 27. As an example, in <u>Lafler v. Cooper</u>, the Supreme Court concluded that defense counsel was ineffective when he advised the defendant to reject the plea offer on the grounds he could not be convicted at trial.

38.     This Court properly held an evidentiary hearing on this issue to resolve factual disputes. (See: <u>United States v. Perez</u>, 177 F.Supp. 2d 342 (E.D. Pa. 2001) (The Court granted an evidentiary hearing on the defendant's claim that his counsel failed to fully advise him as to the opportunities for plea bargaining, since there was no record of his conversations with counsel).

39.     At the evidentiary hearing, the Defendant established that defense counsel (a) failed to obtain from the Government a proposed written plea agreement; (b) failed to share with the Defendant critical discovery prior to proposing a plea agreement for the Defendant's consideration; and (c) advised the Defendant that he could possibly defeat the Government's efforts to convict him beyond a reasonable doubt based on an interstate commerce defense which was not supported by law.

40.     At the evidentiary hearing, the Defendant further established that the outcome of the plea process would have been different, i.e., he would have accepted the plea for 32 years in prison, if he had been able to review all of the discovery pretrial and had been advised that there was no law supporting counsel's proposed defense. (Exhibit "G" at 99-100, 106-108, 116-117, Testimony of Jamal Ezell).

41.     As a result I find that defense counsel clearly violated his duty "... to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." Strickland, 466 U.S. at 688, 104 S.Ct. at 2065.

42.     I find that counsel's performance, in advising the Defendant during plea bargaining, fell below an objective standard of reasonableness. I also find that the Defendant suffered prejudice as a result in that, but for counsel's advice, the Defendant would have not gone to trial, would have accepted the plea offer of 32 years, and would not have received a mandatory sentence of 132 years. Strickland, 466 U.S. at 685-690; Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011).

D.     Claim that Defense Counsel Pursued a Jurisdictional Defense
        which he knew was Contrary to the Law

43.     In an effective assistance analysis, defense counsel is afforded great deference with regard to pursuing a legitimate trial strategy, about which there can be a difference of opinion. Id. at 689, 2065; Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955).

44.     However, unreasonable tactical decisions may support a claim of ineffective assistance of counsel. United States v. Williams, 166 F.Supp. 2d 286, 292 (E.D. Pa 2001).

45.     Here, defense counsel knowingly pursued a jurisdictional defense which was contrary to the law, (See United States v. Urban, 404 F3d 754 (3rd Cir. 2005)), and made no effort to lay the groundwork for establishing a new rule of law. Defense counsel knew that the theory he pursued would be contradicted by the charge of the Court to the jury, which would render the defense theory a nullity and provide the jury with but one choice regarding the element of interstate commerce, the choice presented by the Government.

46.     I find that counsel's performance in pursuing the *no customer activity* defense fell below an objective standard of reasonableness. I also find that the Defendant suffered prejudice as a result in that, but for counsel's advice and trial strategy, the Defendant would have been able to present to the jury viable defenses which could have led to a verdict of not guilty as to all or some of the charges. Strickland, 466 U.S. at 685-690; Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011).

E.      Claim that Defense Counsel's Overall Performance Denied the Defendant a Fair Trial

47.     As noted above, the right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled. Strickland v. Washington, 466 U.S. at 685, 104 S.Ct. at 2063 (1984); Adams v. United States ex rel. McCann, 317 U.S. 269 at 276.

48.     As the Supreme Court stated in Strickland: "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Id., 466 U.S. at 688, 104 S.Ct. at 2065.

49.     Only through effective assistance of counsel can an accused receive a fair trial. Strickland v. Washington, 466 U.S. at 685-686; McMann v. Richardson, 397 U.S. 759, 771, n. 14 (1970).

50.     This Court may consider the cumulative effect of counsel's overall performance and the numerous errors cited herein to determine whether the Strickland standard has been met. See: Buehl v. Vaughn, 1996 U.S. Dist. LEXIS 19509, p. 73-74 (E.D. Pa., Padova, J.).

51.     I find that the overall performance of defense counsel in this matter fell below an objective standard of reasonableness, in that

        (a)     defense counsel failed to take any steps to prohibit the introduction into evidence of irrelevant bad act evidence, and took no action to limit the effect thereof after its admission;

        (b)     defense counsel made arguments to the jury in which he essentially admitted the guilt of the Defendant, supported the credibility of certain key Government witnesses and failed to request specific relief from the jury;

        (c)     defense counsel failed to competently advise the Defendant during the plea bargaining process, including the failure to share with the Defendant all of the critical discovery provided by the Government, and proposing a non-legal defense;

        (d)     defense counsel pursued one defense, being a jurisdictional defense, for which there was no support in the law  Strickland v. Washington, supra; Blystone v. Horn, 664 F.3d 397, 418 (3d Cir. 2011).

52.     I find that the Defendant suffered prejudice as a result of defense counsel's overall performance. The nature of defense counsel's deficient representation, as demonstrated from the opening statement through the closing statement, essentially left the Defendant without an advocate from the beginning to the end of the trial. Therefore, the Defendant did not receive a fair trial as

guaranteed by the Sixth Amendment to the United States Constitution. <u>Strickland v. Washington</u>, 466

U.S. at 685-688; <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n. 14 (1970).

53.     I find that had the Defendant received effective assistance throughout the entire trial,

this most likely would have led to a verdict of not guilty as to all or some of the charges. <u>Strickland</u>,

466 U.S. at 685-690; <u>Blystone v. Horn</u>, 664 F.3d 397, 418 (3d Cir. 2011).

F.     <u>Relief Ordered</u>

54.     The Judgment of conviction is hereby vacated. Title 28 U.S.C. § 2255(b)

55.     The Defendant is hereby granted a new trial on all charges. Title 28 U.S.C. § 2255(b)

56.     The Government be required to propose a plea offer of 32 years in writing. (See: <u>United</u>

<u>States v. Day</u>, 969 F. 2d at 47; specific performance-the pretrial status quo).

57.     An appropriate Order will follow.

Respectfully submitted,

LUTHER E. WEAVER, III, ESQUIRE
Weaver & Associates, P.C.
14th Floor, 1525 Locust Street
Philadelphia, PA 19102-3732
(215) 790-0600
Attorneys for Defendant Jamal Ezell

Dated: June 8, 2015

## CERTIFICATE OF SERVICE

I, LUTHER E. WEAVER, III, ESQUIRE, hereby certify that I have served a copy of the within

Petitioner's Proposed Findings of Fact and Conclusions of Law in Support upon all attorneys of record

by electronic transmission addressed as follows:

Jeffery W. Whitt, Esquire
Joan E. Burnes, Esquire
Assistant United States Attorney
U.S. Attorney's Office for the E.D. of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106


LUTHER E. WEAVER, III, ESQUIRE

DATE: June 8, 2015