# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | | **CIVIL NO. 09-5538** |
| v. | : | |
| | | **CRIMINAL NO. 02-815-01** |
| **JAMAL EZELL** | : | |

## GOVERNMENT'S PROPOSED FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

The United States of America, by its attorneys, Zane David Memeger, United

States Attorney for the Eastern District of Pennsylvania, and Jeffery W. Whitt and Joan E.

Burnes, Assistant United States Attorneys for the District, hereby submits proposed findings of

fact and conclusions of law with respect to Petitioner's <u>Pro</u> <u>Se</u> Motion to Vacate, Set Aside or

Correct Sentence Pursuant to Title 28 United States Code, Section 2255 (Docket No. 196) and

Counsel's Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to Title 28

United States Code, Section 2255 (Docket No. 225).

## I.     BACKGROUND

### A.  Procedural Background

On December 17, 2002, defendant/petitioner Jamal Ezell was charged in a 12-

count indictment. Ezell was charged with six counts of Hobbs Act robbery, in violation of 18

U.S.C. § 1951 and 2, together with six counts of using and carrying and aiding and abetting the

use of a firearm in furtherance of a violent crime, in violation of 18 U.S.C. § 924(c).  The

charges arose out of a two-week period in March 2002, when Petitioner and his associates

robbed six commercial establishments at gunpoint in three counties in and around Philadelphia.

Prior to trial, counsel for Petitioner filed a motion to suppress each of Petitioner's two signed confessions to four of the six robberies. This Court denied the motion. Petitioner also filed over two dozen Pro Se pleadings for his case, all of which this Court denied.

Petitioner proceeded to trial on May 2, 2005. At trial, the government presented the testimony of the victims of each robbery, who identified the inside and outside of their commercial establishments through admitted photographs. The victims also described the gunmen and robbers, and the amounts of money the gunmen removed from the safes or cash registers. The victims also testified about the types of products sold in the stores or restaurants, or types of goods and products used to provide services in the stores or restaurants. The government introduced the various photo line-ups during which five employees from three different robberies independently identified the Petitioner as a participant in the robberies. Photo-prints from a surveillance video showed Petitioner and his associate at the time of one of the robberies (Wine and Spirits). The government introduced photo-prints from a surveillance video of yet another establishment (Motel 6) which the Petitioner and his associates cased, but elected not to rob, immediately before a completed robbery. Two of Petitioner's associates who participated in the robberies testified about the robberies and how stores and restaurants were selected to be robbed. Finally, Petitioner's two written confessions, covering four of the six robberies, were admitted and read to the jury.

On May 6, 2005, the jury found Petitioner guilty of all charges. On March 3, 2006, the district court imposed a sentence of imprisonment of 132 years (1584 months) and one day, a five-year period of supervised release, restitution of $15,227.80, and a special assessment of $1,200.[1]

---

[1] Specifically, the court sentenced Ezell to one day imprisonment on Counts One, Three, Five, Seven, Nine, and Eleven (concurrent); a term of 84 months on Count Two; and a term of 300 months on each of

2

On February 19, 2008, the United States Court of Appeals for the Third Circuit affirmed the judgment of the district court. The order was formally entered on March 12, 2008. Petitioner filed a Writ of Certiorari with the United States Supreme Court which was denied on December 1, 2008. Petitioner then filed a number of Pro Se Motions in district court, including a timely Pro Se Motion pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence imposed by the Court on November 21, 2009. (Docket 196).

On May 9, 2013, Petitioner was appointed attorney Luther E. Weaver, III as counsel to represent him with regard to his pending Pro Se § 2255 Motion. On September 17, 2013, counsel filed an amended motion pursuant to § 2255.[2] (Docket 225).

On February 18, 2014, the government filed the Government's Response to Petitioner's Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Docket No. 231).

On March 25, 2014, the Petitioner filed Petitioner's Memorandum in Reply to the Government's Response to Petitioner's Original and Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Docket No. 233).

On April 30, 2015, an evidentiary hearing was held on Petitioner's Pro Se Motion to Vacate, Set Aside or Correct Sentence Pursuant to Title 28 United States Code, Section 2255 and Counsel's Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to Title 28

---

Counts Four, Six, Eight, Ten, and Twelve. The sentences as to Counts Two, Four, Six, Eight, Ten, and Twelve are consecutive to each other and to the sentences for Counts One, Three, Five, Seven, Nine, and Eleven. In short, the Court sentenced the Petitioner to the mandatory minimum 132 years on the Section 924(c) charges and one day for the Hobbs Act robberies, understandably electing to essentially ignore the much higher advisory guideline range for the Hobbs Act offenses.

[2] Mr. Weaver is Ezell's fifth appointed attorney. Ezell was represented by a succession of three appointed attorneys, Eric Vos, Mark Cedrone, and Christopher Warren, at various points prior to and during his trial. Warren served as trial counsel and represented the Petitioner at sentencing and appeal. For collateral proceedings, NiaLena Caravasos was initially appointed to represent Ezell with respect to his pro se 2255 motion. Caravasos was later allowed to withdraw on May 10, 2013, and Luther Weaver was appointed to represent Ezell.

United States Code, Section 2255. At the hearing Petitioner testified and presented testimony from Christopher Warren, Esquire.

On June 8, 2015, attorney Weaver filed Petitioner's Proposed Findings of Fact and Conclusions of Law In Support of Petitioner's Pro Se Motion and Counsel's Amended Motions Pursuant to Title 28 U.S.C. § 2255 (Docket No. 250). Among the various claims of ineffective assistance of counsel presently being pursued by the Petitioner are the following:

A. Defense counsel failed to object to inadmissible bad act evidence which established that the Petitioner had prior arrests and/or convictions.

B. Defense counsel presented ineffective opening and closing argument to the jury.

C. Defense counsel was ineffective during the plea bargaining process.

D. Defense counsel pursued a jurisdictional defense which he knew was contrary to law.

E. Defense counsel's overall performance denied Petitioner a fair trial.

## B. **Factual Background**

The facts of Petitioner's offenses have been established and discussed over the course of numerous proceedings since the trial in this case in May 2005 and are well-known to this Court. During a two-week period in March 2002, Petitioner, together with his associates Eric Jewell, Eric Mitchell, Alphonso Holder, and Robert Kennell, robbed six commercial establishments at gunpoint. The details of the robberies are set forth at length in the Government's Response To Petitioner's Amended Motion To Vacate, Set Aside Or Correct Sentence Pursuant To 28 U.S.C. § 2255 with reference to the trial transcripts and are incorporated herein by reference. (See Docket No. 231 at pages 8-13).

4

## II.   **PROPOSED FINDINGS OF FACT**

1) Petitioner has been represented by Christopher D. Warren, Esquire since his appointment by this Court in December 2004. (Docket No. 116).

2) Christopher D. Warren, Esquire is an experienced criminal defense attorney. He became a member of the bar of the Commonwealth of Pennsylvania approximately 27 years ago, and has practiced federal criminal law for 27 years. (See Exhibit G at 10, 72).[3]

3) Warren represented Petitioner during certain pretrial matters and also during the four-day jury trial which was held on May 2 to May 6, 2005. (See Exhibit G at 10). Warren also represented Petitioner during his appeal wherein the Third Circuit affirmed the judgment of the district court on February 19, 2008. (See Docket No. 187).

### A.  **Claim That Defense Counsel Failed To Object To Allegedly Prejudicial Bad Act Evidence**

4) Prior to trial, Warren was aware that the Petitioner had a prior criminal record consisting of two convictions and six other arrests. (Exhibit G at 11-14).

5) Petitioner testified that he could not remember if Warren reviewed with him his prior record before trial. (See Exhibit G at 91). He further testified when asked whether there were any discussions between him and Warren about the fact that Petitioner had a prior record and attempts would be made to keep evidence of prior arrests or prior convictions out of the trial: "I really doubt it. I would say no." (Exhibit G at 92).

6) Warren testified that he did not receive any notice from the government of its intent to introduce Rule 404(b) evidence at trial that Petitioner had an arrest record. (See Exhibit G at 25). He also testified that he did not recall making any request to the government for any

---

[3] Petitioner's Proposed Findings of Fact and Conclusions of Law attached the transcript from the April 30, 2015 Evidentiary Hearing as Exhibit G. Therefore, cites to Exhibit G in this pleading refer to the page numbers of the transcripts attached to Docket No. 250.

Rule 404(b) evidence. (Id.)

7)  During the trial there was testimony from Detective Donald Beese of the Upper Darby Township Police Department regarding his investigation of the robbery of the ABC Auto Parts Store in Upper Darby, Pennsylvania on March 5, 2002. (See Exhibit D, May 5, 2005 Tr. at 16); (Exhibit G at 15-16).

8)  Detective Beese testified regarding his process in developing a photo array containing a photo of the Petitioner to show to victims of the ABC Auto Parts robbery. He testified that the Petitioner was not in the Upper Darby Township Police Department database, but he was in the Philadelphia Police Department database. (Id.)

9)  Warren was aware that Beese's references to the Philadelphia Police Department database was a reference to individuals that had been arrested and photographed by the Philadelphia Police Department and that Beese's trial testimony identified Petitioner's photograph as coming from that database. (Exhibit G at 17).

10)  Later during the trial, Detective James Godby of the Upper Merion Township Police Department testified regarding his investigation relating to three of the armed robberies that occurred in Upper Merion Township; the Wine and Spirits shop on Gulph Road on March 5, 2002; the People's Cleaners on Route 202 on March 10, 2002; and the Hooter's Restaurant on Route 202 on March 15, 2002. (See Exhibit D, May 5, 2005 Tr. at 41). He testified about developing a photo lineup containing a photo of Petitioner to show the victims of the robberies. (Exhibit D, May 5, 2005 Tr. at 47-50).

11)  In response to the questioning by the government to explain to the jury what a photo spread is and what it consists of, Godby testified that he created a photo lineup containing a photo of Petitioner by the use of a system called Criminal Photo Identification Network

6

("CPIN"). (See Exhibit D, May 5, 2005 Tr. at 44-45). He went on to essentially explain that the CPIN contains photos of people who have been arrested in Pennsylvania within the last five years. (Id.)

12) During the April 30, 2015 hearing Warren testified that he did not object to Detective Godby's testimony regarding the CPIN containing photos of people who have been arrested in Pennsylvania within the last five years because he "thought the witness was simply explaining how the photo spread was put together." (Exhibit G at 19). In response to the continuing questions by Weaver concerning Warren's decision not to object to Godby's testimony about his development of the photo spread containing Petitioner's photo from CPIN, Warren went on to testify that he thought "[i]t was a non-propensity purpose for which the testimony [of Godby] was offered." (Exhibit G at 20) (See also Exhibit G at 30, 32).

13) Warren further testified that the witness at the trial before Detective Godby was Detective Geary who "had testified that he had arrested [Petitioner] after [Petitioner] confessed to, I believe it was two of the liquor store robberies. So there had already been testimony from a Philadelphia detective that [Petitioner] was arrested, taken into custody and had confessed. Detective Geary then testified, I believe, that he had sent his materials off to the Montgomery County folks. So what [Godby] is referring to here was something the jury had already heard." (Exhibit G at 26-27, 30); (See also Exhibit D, May 5, 2005 Tr. at 27-33, Geary Testimony).

14) Warren also explained that not only did he think Godby's testimony was offered for "a non-propensity purpose" (Exhibit G at 30, 32, 83, 86) "for which testimony is admissible" (Exhibit G at 32), but also as part of his trial strategy he did not object to Godby's testimony or ask for a curative instruction because he did not want to highlight something about arrests to the jury. (See Exhibit G at 30-35, 84, 86).

## B. Claim That Defense Counsel Presented Ineffective Opening And Closing Argument To The Jury

15) Prior to trial in this case Petitioner was arrested by Philadelphia Police local Detectives in Philadelphia on May 17, 2002, and charged with the armed robbery of the Wine and Spirits shop located at 1100 South Delaware Avenue in Philadelphia, Pennsylvania on March 12, 2002. (See Exhibit D, May 5, 2005 Tr. at 27); (Exhibit G at 26-27). At the time of his arrest Petitioner gave a statement in which he confessed to the armed robbery of the Wine and Spirits shop in South Philadelphia, as well as a Wine and Spirits shop in Upper Merion. (Exhibit D, May 5, 2005 Tr. at 30-33); (Exhibit G at 26-27, 30); (Government Trial Exhibit 31).

16) Petitioner was transferred from the Philadelphia Prison System and arrested by Upper Merion Township Police Detectives on May 30, 2002, and charged with the armed robbery of the Wine and Spirits shop in Upper Merion Township. He gave a statement wherein he confessed to his involvement in the armed robbery of the Wine and Spirits shop located in Upper Merion Township on March 5, 2002, and the Hooters Restaurant on Route 202 in Upper Merion Township on March 15, 2002. (Exhibit D, May 5, 2005 Tr. at 51-60); (Exhibit G at 29-30, 82); (Government Trial Exhibit 32).

17) When the case was later adopted federally, Petitioner gave a proffer statement to FBI Special Agent Vito Roselli[4] in which he admitted to his involvement in all six of the armed robberies charged in this case (See Exhibit G at 35-36, 40, 42-43, 81-82). Warren knew that if he or the Petitioner took a factual position inconsistent with what had been admitted to in the proffer session, the government could call Special Agent Roselli as a witness and share the content of the proffer session. (Id.; see also Exhibit G at 46-47).

18) In light of Petitioner's confessions and the overwhelming evidence in this

---

[4] FBI Special Agent Vito Roselli is mistakenly identified in the transcript at Exhibit G as "Rizzelli."

case, Warren elected a trial strategy which entailed challenging whether the crimes affected interstate commerce and therefore did not belong in federal court. (See Exhibit G at 41-43). In his opening and closing statements, Warren presented this defense strategy. (See Exhibit B, May 3, 2005 Tr. at 27-30; Exhibit E, May 6, 2005 Tr. at 28-29, 53-59).

19) Warren's choice of trial strategy was discussed at sidebar immediately preceding the trial. (Exhibit A, May 2, 2005 Tr. at 6-7).

20) Warren discussed his trial strategy with Petitioner after he rejected the government's plea agreement offer and Petitioner did not have a problem with that strategy. (Exhibit G at 62, 78, 126-127).

21) Warren was fully aware that the law in the Third Circuit in the case of United States v. Urban, 404 F.3d 754 (3d Cir. 2005) was not favorable to his defense strategy. (See Exhibit A, May 2, 2005 Tr. at 6-7); (Exhibit G at 68-69, 76-78). However, in executing his defense trial strategy he believed the issue of whether the crimes affected interstate commerce was a fact issue to be determined by the jury. (Exhibit G at 68, 76).

## C. Claim That Defense Counsel Was Ineffective During The Plea Bargaining Process

22) Petitioner had been advised about the opportunity for a plea agreement on numerous occasions throughout the course of this case. (See e.g. Docket No. 60 (Transcript of October 10, 2003 hearing at pages 9, 29, 42)); (Exhibit G at 97-98, 105-109, 119-120, 122).

23) Petitioner's former attorney, Mark E. Cedrone, Esquire, spent a considerable amount of time with the Petitioner to determine if he would accept the government's invitation to discuss a plea agreement. However, as Cedrone reported to the Court in his status letter dated August 18, 2004, Ezell was not interested in accepting a plea agreement offer from the government, unless the government provided some assurances that his sentence would be less

than 32 years. (See Exhibit A, August 18, 2004 letter from Mark E. Cedrone, Esquire to the Court.)

24) Attorney Warren also discussed plea agreement possibilities with the Petitioner prior to trial. (Exhibit G at 57-61, 75-76, 119-120, 122; Testimony of Warren); (Exhibit G at 94, 97-98, 106; Testimony of Ezell). Petitioner continued in his refusal to accept the government's oral plea agreement offer of 32 years. (Exhibit G at 57-61, 97, 119-120, 122). Nevertheless, Petitioner conceded that he fully understood the government's plea agreement offer and was made aware of the offer several times through his attorneys. He admitted this as recently as at the evidentiary hearing on April 30, 2015. (Exhibit G at 109,116).

25) Petitioner contended that one of the reasons he chose not to take the plea deal was because his "big problem" was that he "never had [his] whole discovery." (Exhibit G at 106-107, 116). He further contended that although he received, at least, two packages of discovery, everything in the discovery packages was basically from the state. (See Exhibit G at 116). Petitioner also claimed he never saw the surveillance videotape contained in the government's evidence, although it was not shown during the trial. (Exhibit G at 99).

26) However, Warren testified that, although he does not specifically recall watching the videotapes with the Petitioner, he did communicate the fact of the videotapes and the nature and content of the videotapes with Petitioner along with all the evidence. (See Exhibit G at 121, 124-125). Warren also testified that Petitioner never told him that viewing the videotape was critical to his evaluation of a plea offer and he "would have moved heaven and earth to let him see [the videotapes]" had the Petitioner told him it was necessary to his evaluating a plea offer as opposed to going to trial. (See Exhibit G at 122).

27) Warren made an assessment that the evidence in this case was overwhelming

and Petitioner was likely to be convicted by the jury of the charges. [5] (See Exhibit G at 57, 61, 74-75, 78). Petitioner was informed of the overwhelming nature of the evidence and the likelihood of his conviction by Warren (See Exhibit G at 93, 100, 119), yet he still refused to accept the plea offer of 32 years and took the position that he wanted less than 32 years. (See Exhibit G at 97, 108).

### D. Claim That Defense Counsel Pursued A Jurisdictional Defense Which He Knew Was Contrary to Law

28) As set forth above, in light of Petitioner's confessions and the overwhelming evidence in this case, Warren elected a trial strategy which entailed challenging whether the crimes charged affected interstate commerce and therefore did not belong in federal court (See paragraph 18 above).

29) In pursuing his trial strategy, Warren was fully aware that the law in the Third Circuit case of United States v. Urban, 404 F.3d 754 (3d Cir. 2005) was not favorable to his defense strategy. (Exhibit G at 68-69, 71, 76). However, Warren's trial strategy, consistent throughout the trial, was that the government's evidence could not show the crimes affected interstate commerce, thus they did not belong in federal court, and the jury should make a factual determination of reasonable doubt and acquit Petitioner. (Exhibit G at 37, 41-44, 62-63, 76, 80).

30) Warren faithfully pursued his chosen trial strategy by questioning each witness about interstate commerce and frequently succeeding in getting admissions about the lack of business activity in the stores at the time of the crimes.

### E. Claim That Defense Counsel's Overall Performance Denied Petitioner A Fair Trial

31) Warren's performance did not deny Petitioner a fair trial and his trial

---

[5] In fact, Ezell's former counsel, Mark Cedrone, who represented Ezell before Warren's appointment by the Court, described the case as "indefensible" in open court and in the presence of Ezell. (See Docket No. 60 (Transcript of October 10, 2003 hearing at pages 8 and 37) (Exhibit G at 101; Testimony of Ezell).

strategy was not professionally unreasonable in the face of the overwhelming evidence in this case. That evidence consisted of the testimony of the victims of the six armed robberies; photo line-ups in which five victim employees from three different robberies identified the Petitioner as a participant in the robberies; photo-prints from two separate surveillance videos showing the Petitioner and one of his associates during one of the robberies and the Petitioner and two of his associates casing another establishment; the testimony of two co-conspirators who participated in the robberies with the Petitioner; and two written confessions by the Petitioner to four of the six robberies introduced at trial, along with the prospect of another confession made to Special Agent Vito Roselli being introduced at trial.

32)     Additionally, Warren acted in a professionally reasonable manner by communicating all plea bargain options proposed by the government to his client on multiple occasions and lobbying the Petitioner to accept a proposed plea offer that would have been more favorable to the Petitioner. (Exhibit G at 57-61, 75-76, 119-120, 122; Testimony of Warren); (Exhibit G at 99, 97-98, 106; Testimony of Ezell).

## III.   PROPOSED CONCLUSIONS OF LAW

### A.   The Petitioner Has Failed to Establish That His Attorney Was Ineffective

The Petitioner's claim that his attorney was ineffective has no basis in fact or law, and should be rejected. A Petitioner's claim of ineffectiveness is subject to a stringent test. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). To establish ineffective assistance of counsel, a Petitioner must show both deficient performance by counsel and prejudice. Id at 687.

Deficient performance is only established if a Petitioner can show that his counsel's efforts "fell below an objective standard of reasonableness" under the standard set by "prevailing professional norms." (Id. at 688). "A Court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance" Harrington v. Richter, 562 U.S. 86 (2011) (quoting Strickland, 466 U.S. at 687-89).

In reviewing counsel's performance, the Court must be "highly deferential" to counsel's assistance, without regard to the vantage of hindsight; it must consider the circumstances from counsel's perspective; and it must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the Petitioner must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689-90. In fact, "strategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable." Id.

Furthermore, even if counsel's performance is found to be deficient, the Petitioner must still establish that he has suffered prejudice as a result of the deficient performance. (Id. at 692). To show prejudice, it is not enough to show that the alleged error may have had some "conceivable effect" on the outcome, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." (Id. at 693). Petitioner's burden is to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. See also Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994).

Where, as here, the evidence was overwhelming in support of the jury's verdict, it is more difficult to show that counsel's alleged errors could have prejudiced the Petitioner. United States v. Williams, No. 13-02391, slip op. at 24 (3d Cir. October 24, 2014) (court of appeals noted that evidence of guilt was overwhelming). See Strickland, 466 U.S. at 695–96 ("[w]hen a Petitioner challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt . . . a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); Buehl v. Vaughn, 166 F.3d 163, 181–82 (3d Cir. 1999).

In evaluating ineffectiveness claims, the recommended procedure in the Third Circuit is to examine the prejudice prong of Strickland before evaluating whether counsel's performance was deficient, for if the Petitioner cannot show prejudice, there is no need to address the performance of counsel. See McAleese v. Mazurkiewicz, 1 F.3d 159, 170-71 (3d Cir. 1993); Travillion v. United States, 2012 WL 5354530 at *5 (W.D.Pa. Oct. 29, 2012).

The Petitioner has failed to show that there is a reasonable probability that, but for counsel's alleged failures, the result of the proceeding would have been different. Thus, his ineffectiveness claims should be denied.

**B. Specific Claims**

**Claim That Defense Counsel Failed to Object To Prejudicial Bad Act Evidence**

1) Defense counsel did not fail to object to inadmissible bad act evidence because the photo array evidence was admissible under Federal Rule of Evidence 404(b). Federal Rule of Evidence 404(b) ("Rule 404(b)") prohibits the introduction of evidence of prior crime, wrong, or other act to show a Petitioner's propensity to commit a charged offense. Fed R. Evid.

404(b)(1). Evidence of crimes, wrongs, or other acts may, however, be used for a non-propensity purpose "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b)(2).

2) When addressing the admissibility of prior bad conduct under Rule 404(b), the Third Circuit employs a four-step analysis. In order to admit evidence of prior bad acts, the party seeking to introduce such evidence must show that it is "(1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested." United States v. Caldwell, 760 F.3d 267, 277-78 (3d Cir. 2014) (citing United States v. Davis, 726 F.3d 434, 441 (3d Cir. 2013); see Huddleston v. United States, 485 U.S. 681, 686-91 (1988). The similar acts evidence must be probative of a material issue other than the Petitioner's character. Huddleston v. United States, 485 U.S. at 686.

3) Here, as Warren emphasized in the evidentiary hearing, his failure to object to the photo array evidence amounted to permissible trial strategy. (Exhibit G at 18, 32, 86). Warren believed that the Government presented the evidence to explain how photo spreads were created, a non-propensity purpose. (Exhibit G at 20-21, 24, 30, 32). Warren also made a strategic decision not to object or request a limiting instruction because he did not want to "highlight something about arrests." (Exhibit G at 31-32, 34-35). Thus, Warren's decision not to object to this evidence does not fall below an objective standard of reasonableness. Warren's strategic choice was well within the range of professionally reasonable judgments.

4) Additionally, the defense did not suffer prejudice because of this evidence because it is unlikely that the result of the proceeding would have been different had counsel

objected to this evidence. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Even if Warren's strategy could be categorized as deficient, "there can be no prejudice because the evidence was otherwise overwhelming." United States v. Travillion, 759 F.3d 281, 292 (3d 2014). A judge hearing an ineffectiveness claim must not look at specific errors in a vacuum, but rather "consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. As Warren emphasized, the case was not triable and the evidence was overwhelming. (Exhibit G at 74-75). In addition to the testimony of the victim witnesses and two cooperating co-conspirators, the jury heard evidence of four robbery confessions by Petitioner and defense counsel strategized to keep an additional two confessions out of the trial. (Exhibit G at 40, 42, 73). The result of the proceeding was neither unfair nor unreliable and therefore no prejudice can be alleged because Warren purportedly failed to object.

### Claim that Defense Counsel Presented Ineffective Opening and Closing Arguments

5) Defense counsel's opening and closing statements fall within the parameters of counsel's trial strategy. As mentioned previously, counsel is given great deference in executing his or her strategy and "tactical decisions are not grounds for an ineffective assistance claim unless counsel displayed 'ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles.'" Holland v. Horn, 150 F. Supp. 2d 706, 727 (E.D. Pa. 2001) (citations omitted). Unreasonable strategy in opening or closing arguments has been determined to exist when this strategy has "rendered [counsel's] assistance ineffective" at later stages of the proceedings. Buehl v. Vaughn, 1996 WL 752959 (E.D. Pa. 1996).

6) Warren strategically chose to attempt to minimize the role of the Petitioner in the robberies as part of his interstate commerce theory. (Exhibit G at 45). With this strategy,

Warren attempted to maintain credibility with the jury and not deny factual guilt, as well as avoid the introduction of the proffer confessions. (Exhibit G at 47). Defense counsel even went so far as to discuss his choice of trial strategy at sidebar immediately preceding trial. (See Exhibit A, May 2, 2005 Tr. at 6-7). After such thorough discussion of his strategy with the court and his client, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Warren vigorously pursued this line of defense throughout trial, and the court cannot speculate in hindsight as to whether another line of defense might have procured a different result. Warren's performance in pursuing this line of defense cannot be categorized as deficient because it was undertaken after "an independent examination of the facts, circumstances, pleadings and laws involved." Id. at 680. The strategy employed by Warren hardly constitutes error "so serious that counsel was not functioning as the 'counsel' guaranteed the petitioner by the Sixth Amendment." Id. at 687.

7) Furthermore, Warren's opening and closing statements cannot reach the level of prejudice to the defense considering the overwhelming evidence in this case. The Petitioner made two formal confessions to local law enforcement, confessing to four of the six robberies. Further, the jury saw still frames from surveillance video showing the Petitioner and his accomplices at one of the robbery locations. Eyewitness testimony corroborated the surveillance video. Additionally, five employees from three different robberies independently identified the Petitioner. Also, two of Petitioner's co-conspirators testified about his participation and role in the six armed robberies. (Exhibit G at 73-74). As Warren emphasized, "the evidence was overwhelming...it was not a triable case." (Exhibit G at 74-75).

**Claim That Petitioner Was Denied His Right To Effective Assistance Of Counsel During The Plea Bargaining Process**

8) The Sixth Amendment right to counsel encompasses the plea bargaining stage of a criminal proceeding. Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012). In Hill v. Lockhart, 474 U.S. 52, 57 (1985), the Court established that claims of ineffective assistance of counsel in the plea bargain phase must be evaluated by the Strickland two-part test. Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012). Thus, counsel's performance in the plea bargaining context must be both deficient and prejudicial to the defense to succeed on a claim of ineffective assistance of counsel.

9) In order for a Petitioner to show deficient representation under the first prong of the Strickland test, defense counsel's performance must fall below "an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. A Petitioner must then show that this deficient representation prejudiced the defense and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

10) A Petitioner has the right to competent counsel throughout the plea bargaining process and if a bargain has been offered, the Petitioner has the right to competent advice from counsel regarding the proposed deal. Lafler, 132 S. Ct. at 1387. Petitioners have the right to effective assistance of counsel that advises him or her whether to accept or reject a plea offer. Id. at 1387. "If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." Id. Federal Petitioners do not have the right to be offered a plea, however, and a federal judge is not required to accept a brokered plea deal. Id.

11) Although Petitioners lack this overall right to a plea bargain, defense counsel does, however, "have the duty to communicate formal offers from the prosecution to accept a

18

plea on terms and conditions that may be favorable to the accused." Frye, 132 S. Ct. at 1408.

12) Accordingly, "a Petitioner must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the Petitioner would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler, 132 S. Ct. at 1385.

13) Here, Warren advised the Petitioner on numerous occasions that his chances of acquittal at trial were dismal. (Exhibit G at 57, 61, 64-65, 74-76). The Petitioner even conceded that Warren never admitted that he would win the case at trial. (Exhibit G at 93).

14) The Petitioner claimed that the outcome of the plea bargaining process would have been different had he been able to review all of the discovery materials before trial. (Exhibit G at 99-100, 106-07, 116-17). Warren, however, discredits this testimony when he explains that he remembers "discussing all of the evidence against [the Petitioner]." (Exhibit G at 66, 124). Defense counsel further emphasizes that he "went over the evidence repeatedly with him." (Exhibit G at 66). Warren explained that the Petitioner never mentioned that he would be able to "better evaluate a plea offer" if he had seen the video footage and other purportedly missing discovery materials. (Exhibit G at 122). Warren goes so far as to say he "would have moved heaven and earth to let him see that" if it would have made a difference in the plea bargaining process. (Exhibit G at 122).

15) After discussing the Petitioner's chances at trial and the opportunity provided by the Government in the plea deal, defense counsel repeatedly implored the Petitioner to accept the deal, but the Petitioner continually refused. (Exhibit G at 57-59, 61, 75, 97, 106-08, 116,

19

119, 122). Thus, Warren was not ineffective during the plea bargaining process.

## Claim That Defense Counsel Pursued A Jurisdictional Defense Which He Knew Was Contrary To The Law

16) Defense counsel's choice of trial strategy does not constitute ineffective assistance of counsel because his performance did not fall below "an objective standard of reasonableness" and it did not prejudice the defense. Strickland, 466 U.S. at 688, 693.

17) Counsel's well-investigated choice of strategy is "virtually unchallengeable" and a Petitioner must overcome a strong presumption that counsel's choices were outside the bounds of reasonable professional conduct. Id. at 690, 699.

18) Here, defense counsel had the insurmountable task of creating a defense theory that would not deny factual guilt while simultaneously excluding the Petitioner's proffer statements from evidence. Considering the overwhelming evidence in this case (as described above), defense counsel creatively focused on a factual issue rather than a legal argument so that maybe the jury would decide that "he [Petitioner] didn't need to die in federal prison for six armed robberies." (Exhibit G at 81).

19) Warren's proposal of attacking the interstate commerce aspect of the charges did not comport with the law of the Third Circuit, but nonetheless, he believed that the jury could find the fact issue in the Petitioner's favor. (Exhibit G at 68); (see United States v. Urban, 404 F.3d 754 (3d Cir. 2005)).

## Claim That Defense Counsel's Overall Performance Denied The Petitioner A Fair Trial

20) As previously mentioned, a Petitioner must prove both prongs of the Strickland test to obtain relief under 28 U.S.C. § 2255. Thus, the Petitioner must show that not only was counsel's performance deficient and outside the standard of "reasonably effective assistance,"

but the Petitioner must show that but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 687, 692. Therefore, "unless a Petitioner makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

21) The Petitioner here cannot satisfy either prong of the Strickland test for the reasons set forth above, but particularly he is precluded from relief under 28 U.S.C § 2255 because of the clear lack of prejudice in these proceedings. The Petitioner repeatedly rejected a plea agreement with the Government that would have reduced his mandatory minimum sentence from 132 to 32 years. The Petitioner faced six 924(c) violations and the Government offered to waive four of these counts during plea negotiations. (Exhibit G at 57-59). The Government generously removed the cooperation requirement from the Petitioner's final plea offer, but he still rejected the lower sentence. (Exhibit G at 58, 97).

22) Because of the overwhelming evidence described above, any alleged error committed on the part of defense counsel was harmless. The Petitioner cannot claim prejudice sufficiently probable to undermine confidence in the outcome. Strickland, 466 U.S. at 694. Therefore, the Petitioner's claim of ineffective assistance of counsel must fail because it does not pass the two-part test set forth in Strickland. 466 U.S. at 700.

## IV.   A CERTIFICATE OF APPEALABILITY SHOULD NOT ISSUE

Upon the denial of a Section 2255 motion by the district court, an appeal to the Court of Appeals by the Petitioner is not permitted unless he obtains a certificate of appealability. 28 U.S.C. § 2253. The law permits the issuance of a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

21

The application for such a certificate should first be made to the district court. Local Rule 22.2 provides as follows:

> At the time a final order denying a petition under 28 U.S.C. § 2255 is issued, the district judge shall make a determination as to whether a certificate of appealability should issue. If the district judge issues a certificate, the judge shall state the specific issue or issues that satisfy the criteria of 28 U.S.C. § 2253. If an order denying a petition under 2254 or 2255 is accompanied by an opinion or a magistrate judge's report, it is sufficient if the order denying the certificate references the opinion or report.

The Third Circuit has further instructed that "as a matter of practice . . . an unsuccessful movant in a [section] 2255 case should in the first instance seek a certificate of appealability from the district court." United States v. Williams, 158 F.3d 736, 742 n.4 (3d Cir. 1998).

Accordingly, in the interests of judicial economy, the government requests that in addition to denying the instant petition, this Court also find that the Petitioner has failed to make a substantial showing of a denial of any constitutional right.

To present a "substantial showing of a denial of any constitutional right," to justify an appeal, the mere allegation of a constitutional wrong, such as deprivation of the right to effective counsel, is insufficient; the Petitioner must make a substantial showing of such an error in order to present an appeal. Santana v. United States, 98 F.3d 752, 757 (3d Cir. 1996). To establish the required showing, "[t]he Petitioner must demonstrate that reasonable jurists would find the district Court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). The Petitioner has not done so here.

The Petitioner has failed to make a substantial showing that he was deprived of the right to effective counsel, or of the right to a fair trial. Therefore, no certificate of appealability should be issued.

22

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny

Petitioner's Pro Se and Amended Motion To Vacate, Set Aside or Correct Sentence Pursuant to

28 U.S.C. § 2255 and issue a finding that no certificate of appealability be granted.


Respectfully yours,

ZANE DAVID MEMEGER
United States Attorney


JEFFERY W. WHITT
JOAN E. BURNES
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been electronically filed and served by first-class

mail, postage prepaid, upon:

Luther E. Weaver, III, Esquire
Weaver & Associates, P.C.
1525 Locust Street, 14th Floor
Philadelphia, PA 19102-3732

JEFFERY W. WHITT
Assistant United States Attorney

Dated: July 24, 2015